UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-11517-RGS

SANDRA L. HICKS

v.

JANET NAPOLITANO

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

May 10, 2013

STEARNS, D.J.

Plaintiff Sandra Hicks, a civilian United States Coast Guard employee, alleges that she was passed over for a promotion because of her gender and race in violation of Title VII. Defendant Janet Napolitano now moves for summary judgment contending that there is no evidence that the Coast Guard's stated reason for not promoting Hicks – that the competing candidate, Coast Guard Warrant Officer Terry Krout, earned higher marks during the promotional panel interviews – was a pretext for discrimination. Hicks objects that her "superior" qualifications "and Krout's lack thereof," as well as the panel's over-reliance on answers to subjective questions, create a jury-worthy issue of discrimination.[1] The court heard oral argument on the motion

---

[1] Hicks also contends in her Opposition to summary judgment that she was subjected to a hostile and discriminatory work environment. Pl. Opp'n at 8. However,

for summary judgment on May 2, 2013.

## BACKGROUND

The following material facts are undisputed.  Hicks is a civilian employee at the Coast Guard Housing Office at Air Station Cape Cod, a part of the Massachusetts Military Reservation.  Hicks has a high school diploma and has taken several college-level courses.  She has worked for the federal government for twenty years, including twelve years in the Housing Office, although she never served in the uniform branch of the Coast Guard.

The Housing Office arranges lodgment for Coast Guard enlistees and their families in Massachusetts and Rhode Island (except for those who are quartered on

---

because Hicks failed to raise this claim in her administrative charge, it is not now properly before the court. *Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 31 (1st Cir. 2009), quoting *Powers v. Grinnell Corp.*, 915 F.2d 34, 38 (1st Cir. 1990) ("'The scope of the civil complaint is accordingly limited by the charge filed with the [employing agency] and the investigation which can reasonably be expected to grow out of that charge.'"); *see also Velazquez-Ortiz v. Vilsack*, 657 F.3d 64, 71 (1st Cir. 2011) (same).  In her charge, Hicks stated that "I am filing this complaint on the basis of racial discrimination because an unfair promotion of an outside protected class in-office employee was promoted over me, a protected class in-office employee." Gov't Ex. 11 at 4.  Hicks identified "18 December 2009" – the date of the promotional interview – as the date when the discrimination occurred. *Id.*  While a generous reading of the entire charge includes a claim of gender discrimination, no mention was made in the charge of any "severe or pervasive" course of discriminatory treatment that might be construed as fostering an abusive environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986).

Coast Guard vessels). Four hundred Coast Guard housing units (330 of which are reserved for families) are located "on base" at Otis Air Force Base, which is also part of the Military Reservation. An additional 70 housing units are maintained "off base." Hicks is the only African American to have been employed at the Housing Office since she began work there in 2000.

The Housing Office is staffed by seven civilian employees under the supervision of a Housing Manager, a GS-11 position. In October of 2009, the Department of Homeland Security posted the Housing Manager's position. The posting read in relevant part:

> Qualifications:
>
> GS-11 level: Applicants must have one year of specialized experience .
> . . .
> Specialized experience is experience in the field of housing management that require[s] application of a variety [of] general business principles and practices concerning the purchase, lease, rental, and overall utilization of housing facilities.

At the time, Hicks and Krout both worked in the Housing Office as Housing Management Specialists, a GS-9 position. After 24 years of active service in the Coast Guard where he rose to the rank of Chief Warrant Officer,[2] Krout retired and began

---

[2] A Chief Warrant Officer ranks above the most senior of the enlisted ranks, but below a commissioned officer's grade. Chief Warrant Officers are commissioned by the President of the United States and take a commissioned officer's oath.

civilian employment at Air Station Cape Cod in 2002. In April of 2007, he became a Housing Management Specialist. Krout's primary duty was to inspect the 330 on-base family housing units before Coast Guard families took residence, to answer their questions, and to reinspect the units when the families moved out. Hicks's primary duty was to manage the 70 off-base units. Although she oversaw fewer units than Krout, her responsibilities were broader in that she completed all of the administrative paperwork related to the inspections, handled complaints from service personnel regarding housing, and each year was responsible for locating one new off-base unit for lease.

Krout and Hicks were "the two top candidates from the Merit Promotion List," and both were selected to be interviewed for the Housing Manager's position. Blackman Decl. at 5. The interview panel was composed of three males: Commander Paul Rendon (Hispanic), Bruce Blackman (white), and Kevin Sullivan (white). Commander Rendon, the Facilities Engineer/Personnel Officer at Air Station Cape Cod, was the Housing Manager's direct report. Blackman served as the Area Housing Officer. Sullivan was the Air Station Cape Cod Director of Morale, Wellbeing, and Recreation. The panel's task was to interview Hicks and Krout and recommend the

best scoring candidate to the appointing official, Commander John Newby (white).[3]
The interviews took place in December of 2009. Hicks and Krout were each asked the same twenty questions. Krout's interview lasted 40 minutes; Hicks's interview took an hour and forty minutes.

The panelists ranked the candidates' answers on a scale of 1 (lowest) to 3 (highest). Sullivan awarded a total of 50 points to Hicks and 49 to Krout. *See* Gov't Ex. 6. Blackman awarded 44 points to Hicks and 45 to Krout. *See* Gov't Ex. 7. Commander Rendon's scores were 48 for Hicks and 54 for Krout.[4] *See* Gov't Ex. 8. Rendon forwarded the results to Commander Newby with the explanation that

> Kevin Sullivan, Bruce Blackman & I completed two interviews this morning for the . . . GS-11 Housing Manager position. The scoring was close, but in the end Mr. Terry Krout is being recommended for the job. Request you approve the selection. . . . Before we make this selection public, I would like to meet with the other applicant (Ms. Sandra Hicks) & advise her of the decision in person.

Commander Rendon noted that the recommendation was based solely on the

---

[3] Hicks testified that she had a good working relationship with all three men. She had known Commander Rendon for about six months, and Blackman and Sullivan for approximately nine years each. Hicks Dep. at 75-77. Blackman had served on the interview panel that had chosen Hicks for the Housing Specialist's position.

[4] Rendon testified that Hicks had given vague, rambling, and unfocused answers, and appeared to lack a vision of how she would improve the management of the Housing Department. In contrast, Rendon testified that Krout was detailed and specific as to the changes he would implement.

"responses to interview questions." Commander Newby approved the selection of Krout.

Two days later, Commander Rendon met with Hicks and told her that the panel had judged her's and Krout's qualifications to be roughly equal, and consequently they had relied solely on the interview scores in coming to a final decision. Commander Rendon told Hicks that she had not performed as well as Krout during the interviews.[5]

## DISCUSSION

Title VII denial-of-promotion claims are analyzed under the familiar *McDonnell-Douglas* burden-shifting framework. *See Goncalves v. Plymouth Cnty. Sheriff's Dep't*, 659 F.3d 101, 104-105 (1st Cir. 2011), citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). Under *McDonnell-Douglas*, Hicks must initially make out a prima facie case of discrimination by showing that "(1) she is a member of a protected class, (2) she was qualified for the open position for which she applied, (3) she was rejected for that position, and (4) someone holding similar qualifications received the position instead." *Goncalves*, 659 F.3d at 105. If Hicks meets this entry-level burden, it falls to the government to articulate a lawful,

---

[5] Rendon asked Hicks whether she had considered doing a mock interview session with her husband the night before. Hicks viewed Rendon's query as patronizing.

6

non-discriminatory reason for the adverse employment decision. *Id.* "If the defendant provides such a reason, the *McDonnell-Dougla*s framework – with its presumptions and burdens – is no longer relevant. Instead, the ball returns to [Hicks's] court, in which she must prove by a preponderance of the evidence that defendant's alleged nondiscriminatory reason was in fact a pretext for discrimination." *Id.* (citation and internal quotation marks omitted). To satisfy this final burden, Hicks must show not only that she was qualified for the position, but that the employer's stated reason for selecting another candidate was false and that the real reason was race and/or gender discrimination.

> When an employer claims to have . . . promoted one person over another on the basis of qualifications, the question is not which of the aspirants was better qualified, but, rather, whether the employer's stated reasons for selecting one over the other were pretextual. In a rare case, the disappointed applicant may be able to prove pretext by showing that she was in fact better qualified than the individual selected. But that is an uphill struggle: in the absence of strong objective evidence (e.g., test scores), proof of competing qualifications will seldom, in and of itself, be sufficient to create a triable issue of pretext.
>
> This result follows from a form of the business judgment rule. Qualifications are notoriously hard to judge and, in a disparate treatment case, more must be shown than that the employer made an unwise personnel decision by promoting "X" ahead of "Y." In other words, subjective evidence of competing qualifications seldom provides a principled way for a factfinder to determine whether a given employment decision, even if wrong-headed, was anything more than a garden-variety mistake in corporate judgment.

*Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74 (1st Cir. 2004) (citations and internal quotations omitted).

The parties do not dispute that Hicks has made out a prima facie case of discrimination or that the government has provided a nondiscriminatory reason for its decision – that Kraut was selected because he was qualified and outperformed Hicks at the panel interview. The government also notes that over Hicks's tenure at Air Station Cape Cod the Housing Manager's position has been held by more women than men, *see* Hicks Dep. at 41-42, and there is no evidence that a black person other than Hicks has ever applied for the position.

In her effort to discredit the government's explanation, Hicks advances as her principal argument the assertion that her qualifications, far from being "roughly equal" to those of Krout, were so far superior that "a reasonable jury might conclude that defendant's reasons for selecting Mr. Krout are pretexts for discrimination." Pl. Opp'n at 7.[6] As a broad proposition, Hicks's theory of the case finds support in no less an authority than the United States Supreme Court, which has said in dicta that "qualifications evidence may suffice, at least in some circumstances, to show pretext."

---

[6] She also derides Krout as being not even minimally qualified for the Housing Manager's position because of his lack of experience with "the 'purchase, leasing or rental' of housing facilities." *Id.* at 6.

8

*Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006), citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 187-188 (1989) (suggesting that a plaintiff "might seek to demonstrate that respondent's claim to have promoted a better qualified applicant was pretextual by showing that she was in fact better qualified than the person chosen for the position"), superseded on other grounds by 42 U.S.C. § 1981(b); *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981) ("The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination").  While in *Ash*, the Court declined to endorse the metaphorical barrier erected for plaintiffs by the Eleventh Circuit in *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004) – "[p]retext can be established through comparing qualifications only when 'the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face'" – it looked with approval to less demanding standards imposed by other Circuit Courts.

> The visual image of words jumping off the page to slap you (presumably a court) in the face is unhelpful and imprecise as an elaboration of the standard for inferring pretext from superior qualifications. Federal courts, including the Court of Appeals for the Eleventh Circuit in a decision it cited here, have articulated various other standards, *see, e.g.*, *Cooper, supra*, at 732 (noting that "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question" (internal quotation marks omitted)); *Raad*

> *v. Fairbanks North Star Borough School Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003) (holding that qualifications evidence standing alone may establish pretext where the plaintiff's qualifications are "'clearly superior'" to those of the selected job applicant); *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc) (concluding the factfinder may infer pretext if "a reasonable employer would have found the plaintiff to be significantly better qualified for the job"), and in this case the Court of Appeals qualified its statement by suggesting that superior qualifications may be probative of pretext when combined with other evidence, *see* 129 Fed.App'x., at 533. This is not the occasion to define more precisely what standard should govern pretext claims based on superior qualifications. Today's decision, furthermore, should not be read to hold that petitioners' evidence necessarily showed pretext. The District Court concluded otherwise. It suffices to say here that some formulation other than the test the Court of Appeals articulated in this case would better ensure that trial courts reach consistent results.

*Ash*, 546 U.S. at 457-458; s*ee also Provenzano v. LCI Holdings, Inc.,* 663 F.3d 806, 815 (6th Cir. 2011), quoting *Bartlett v. Gates*, 421 Fed. App'x 485, 490-491 (6th Cir. 2010) ("Relative qualifications establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains other probative evidence of discrimination.").

With this counsel in mind, I turn to Hicks's claim that her credentials were so plainly superior to Krout's that no reasonable employer could have passed her over for any reason other than discrimination. At the time of the panel interview, Hicks had

twenty years of federal government service – Krout had thirty-one. During Krout's Coast Guard military career, as a Chief Warrant Officer he managed the contracting office on the ship or base where he was stationed supervising from two to twelve subordinates. He counseled active service personnel on pay and entitlements, and prepared and oversaw annual budgets (and their audits) as large as $15 million. As part of his purchasing duties, Krout prepared quote packages, obtained quotes, and evaluated and awarded supply contracts. While stationed on the USCG SHERMAN, Krout established a ship supply network throughout the Pacific basin. Hicks by contrast had no military service, but she had worked in the Housing Office since 2000. While Krout began working at Air Station Cape Cod in 2002, he transferred into its Housing Office in 2007. At the time of the interview, both Hicks and Krout held the title of Housing Management Specialist and both were classified at the GS-9 level. As previously observed, Hicks had a larger gamut of job duties than Krout, including obtaining leases for private, off-base Coast Guard housing and fielding housing complaints. However, both Hicks and Krout were responsible for the inspections of the housing they oversaw. Looking at the resumes of the two candidates, no reasonable jury could conclude that Hicks's qualifications so outweighed those of Krout – hers were superior in some respects, but Krout's were superior in others – that it was more

likely than not, discriminatory animus provided the job clincher.[7]

Hicks's alternative argument, "that the panel's alleged reliance on subjective questions [at the interview] were pretexts for discrimination," Pl. Br. at 7, is somewhat difficult to penetrate. Hicks does not dispute the fact that both she and Krout were asked the identical twenty questions. She claims, however, that the wording of the questions was "generic and not related to actual job duties or the applicant's experiences, the questions and rating thereof allow[ed] for subjectivity and ad hoc determination" creating a "ready mechanism for discrimination." Pl. Opp'n at 7, quoting *Dukes v. Walmart*, 474 F.3d 1214, 1231 (9th Cir. 2007), rev'd in part *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011); *see also Aka*, 156 F.3d at 1298

---

[7] At her deposition, Hicks claimed that Krout was selected for the position only because of his prior military service. Hicks Dep. at 108-111. The only support she gives for this contention is the names of several other employees at Air Station Cape Cod who are former members of the military. *Id.* at 110. This hardly qualifies as evidence of preference, but even if it did, the law would have permitted the panel to give extra weight to Krout's military service. *See Keyes v. Sec'y of the Navy*, 853 F.2d 1016, 1020-1021 (1st Cir. 1988), citing 42 U.S.C. § 2000e-11. The only other "evidence" that Hicks offers is her personal opinion that she was the more qualified candidate than Krout. Personal perception, in and of itself, is insufficient to create a material factual dispute requiring jury resolution. *See Vega-Colon v. Wyeth Pharm.*, 625 F.3d 22, 28 (1st Cir. 2010), citing *Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8, 15 (1st Cir. 1998) (an employee's "personal opinion regarding his own job qualifications is not sufficiently probative on the issue of pretext" in an employment discrimination case); *see also Simms v. Okla. ex rel. Dep't of Mental Health*, 165 F.3d 1321, 1329 (10th Cir. 1999) (same).

("[C]ourts traditionally treat explanations that rely heavily on subjective considerations with caution . . . [since] an employer's reliance on subjective feelings about candidates may mask discrimination.").

Hicks states that she took offense at Commander Rendon's "tone of voice" when he asked her to identify a personal strength and a weakness. Hicks Dep. at 73-76. Hicks labels the use of the word "weakness" as discriminatory because in her opinion black women have been historically viewed as weak. As she explains it:

> I've always experienced . . . [t]he inferences to my race as being weak. And then, as a woman who is Black, then I am lesser because I am termed minority. So, to me, it is cultural conditioning when a person uses certain words with inference on weakness, when a question does not actually ask it, it infers it. So, the use of the word versus an inference is, there is a decision that an interviewer should be able to make and use or not use words that would make the interviewee feel uncomfortable.

*Id*. at 80-81. While there is no reliable means (other than a contemporaneous recording) of recreating an interviewer's "tone of voice," there is nothing inherently discriminatory about a question asking a candidate to identify her strengths and weaknesses. The question is a staple of self-help publications and is asked by so many job interviewers as to have become a virtual cliché for job applicants.[8] Nor was it

---

[8] This is the only question to which Hicks specifically objects as subjective. Although she states generally that the questions were not "job-related," having reviewed them I cannot but note that most are so broadly worded as to provide an interviewee with ample running room to tout her qualifications and experience. *See*

13

wrong, much less discriminatory, for the panel to base its ultimate decision on the results of the oral interviews. *See Velazquez-Ortiz,* 657 F.3d at 76 (no evidence of pretext where despite finding a losing candidate highly qualified, the selection committee had "put 'a lot of weight' on the interview" and selected candidate with better oral communications skills who "did exceptionally well during the interview").

Finally, Hicks's reliance on the holding of *Aka* is unpersuasive. In *Aka*, the court found plus factors that are not present here. "[V]iewing the evidence [in *Aka*] as favorably to plaintiff as reason will permit . . . a reasonable factfinder could conclude that both that the balance of qualifications weighed markedly in [plaintiff's] favor, and that there was *other* evidence calling [the employer's] explanation into question . . . to infer discrimination." 156 F.3d at 1295 (emphasis added). The *Aka* court specifically acknowledged that "[a]n employer may of course select a candidate who on paper is less qualified for other reasons, such as subjective reactions that emerge in the interview." *Id.* at 1294 n.10. *Cf. Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions.").[9]

---

Gov't Reply at 5 (listing interview panel questions asked of Hicks and Krout).

[9] Hicks claimed at her deposition that one of her coworkers heard Evelyn Norton, the predecessor Housing Manager, refer to Hicks as an "angry black woman." The statement is inadmissible hearsay. Moreover, there is no evidence that Norton had

14

Because no reasonable fact-finder on this record could conclude that gender or race was a motivating factor in the panel's decision to select Krout for the Housing Manager's position, defendant's motion for summary judgment will be allowed.

ORDER

For the foregoing reasons, the government's motion for summary judgment is <u>ALLOWED</u>.  The Clerk will enter judgment accordingly and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

any involvement in the promotion decision.